1  ROBERT P. ANDRIS (SBN 130290)
   LAEL D. ANDARA (SBN 215416)
2  AMY K. GRUBER (SBN 239793)
   ROPERS, MAJESKI, KOHN & BENTLEY
3  1001 Marshall Street, Suite 300
   Redwood City, CA  94063
4  Telephone:   (650) 364-8200
   Facsimile:    (650) 780-1701
5  Email: randris@ropers.com
         landara@ropers.com;  agruber@ropers.com
6
   Attorneys for Plaintiff
7  DESTINY TOOL, a California corporation

8               UNITED STATES DISTRICT COURT

9               NORTHERN DISTRICT OF CALIFORNIA

10

11 DESTINY TOOL, a California            CASE NO.
   corporation,
12                                       **COMPLAINT FOR:**
                Plaintiff,
13                                       1. **MALICIOUS PROSECUTION OF**
   v.                                       **PATENT INFRINGEMENT LAWSUIT**
14
   SGS TOOLS COMPANY, an Ohio            2. **ABUSE OF PROCESS**
15 corporation, DAUPHIN PRECISION
   TOOL, LLC, a Pennsylvania limited     3. **MONOPOLIZATION IN VIOLATION**
16 liability company, and WELDON TOOL       **OF SECTION TWO OF THE**
   COMPANY, an Ohio corporation,            **SHERMAN ACT (15 U.S.C. §2);**
17
                Defendants.              4. **ATTEMPTED MONOPOLIZATION IN**
18                                          **VIOLATION OF SECTION TWO OF**
                                            **THE SHERMAN ACT (15 U.S.C. §2)**
19
                                         **JURY TRIAL DEMANDED**
20

21       1.      Plaintiff Destiny Tool ("Destiny") by and through its attorneys, complains of

22 defendants SGS Tool Company ("SGS"), Dauphin Precision Tool, LLC ("Dauphin") and

23 Weldon Tool Company ("Weldon"), as follows:

24                              **THE PARTIES**

25       2.      Destiny Tool is a corporation organized and existing under the laws of the State of

26 California, having its principal place of business located at 3232 De La Cruz Blvd., #C, Santa

27 Clara, California 95054.  Destiny Tool is engaged in the business of manufacturing, marketing

28 and selling metal cutting tool products including carbide end mills.

Ropers Majeski Kohn & Bentley
A Professional Corporation
Redwood City

RC1/437768.1/LD

COMPLAINT
DEMAND FOR JURY

3.     Upon information and belief, SGS Tools Company is a corporation organized and existing under the laws of the State of Ohio, having its principal place of business located in Munroe Falls, Ohio.  At all relevant times herein, SGS was in the business of selling and manufacturing carbide end mills.

4.     Upon information and belief, Dauphin Precision Tool, LLC is a limited liability company organized and existing under the laws of the Commonwealth of Pennsylvania, having its principal place of business located in Millersburg, Pennsylvania.  Upon information and belief, defendant Dauphin is the successor in interest of the Weldon Tool Company.  Upon information and belief, Dauphin is a parent company and/or manufacturer of several cutting tool manufacturers, namely, Weldon Tools, Data Flute CNC, Brubaker Tools, Fastcut Tools and New England Tap, among possible others.  At all relevant times herein, Dauphin was in the business of selling and manufacturing end mills.

5.     Upon information and belief, Weldon Tool Company is a corporation organized and existing under the laws of the State of Ohio, having its principal place of business located in Millersburg, Pennsylvania.  At all relevant times herein, Weldon was in the business of selling and manufacturing end mills.

6.     SGS, Dauphin and Weldon are the owners of U.S. Patent No. 5,049,009 for an "Improved Cutting Tool." ('009 Patent; attached hereto as Exhibit A.)

7.     Upon information and belief, and at all relevant times herein, defendants SGS, Dauphin, and Weldon sold and advertised end mills that they claimed were patented.

## JURISDICTION AND VENUE

8.     The Court has jurisdiction over the claims for relief arising under the Sherman Act, 15 U.S.C. § 2 (Counts 3 and 4), pursuant to 15 U.S.C. § 4 and 28 U.S.C. §§ 1331 and 1337.  The Court has supplemental jurisdiction over the remaining claims for relief arising under state law (Counts 1 and 2) pursuant to 28 U.S.C. § 1367.

9.     Venue is proper in this district pursuant to 15 U.S.C. §§ 15, 22, 26, and 28 U.S.C. § 1391 because each of the defendants is transacting and doing business and conducting or otherwise transacting their affairs in this district, the defendants have performed acts in

Ropers Majeski Kohn & Bentley
A Professional Corporation
Redwood City

furtherance of their illegal and wrongful conduct alleged in this Complaint which have had substantial effects in this district, and a substantial part of the events giving rise to the claims in this action occurred in this district.

10.    Upon information and belief, plaintiff alleges that defendants, and each of them, have transacted business, availed themselves of the benefits of the laws and regulations of the State of California, and have committed tortious acts in California and within this judicial district, and by transacting other business in this district.  Therefore, this Court has personal jurisdiction over each and all of the named defendants.

11.    In addition, at all relevant times herein, defendants, and each of them, have been selling the products under fraudulent advertising to California residents, and have actively and purposely prevented California businesses from entering the said product market.

## FACTS COMMON TO ALL CLAIMS FOR RELIEF

### The Weldon Tool Company and the Metal Cutting Industry Since the 1960's

12.    End mills are tools used in industrial fabrication shops to cut and shape metals. End mills look a lot like conventional drill bits, but they operate differently in two ways.  Like drill bits, end mills are cylindrical in shape, made of various types of metals and generally have two ends.

13.    The "shank" section of an end mill is generally smooth and is inserted into a milling machine.  These milling machines, like hand drills and drill presses, lock onto the shank portion of the end mill and rotate the tool at high RPMs.  "Work material" (e.g., a block of aluminum) is then positioned under the spinning end mill and the work material is cut and shaped to its desired dimensions.

14.    Unlike end mills, drill bits are designed to only cut with their tips or "end cutting faces."  As such, when positioned vertically above a workpiece, drills are only able to remove metal in a downward direction.

15.    End mills, on the other hand, cut not only in a downward direction with end cutting teeth, end mills also have cutting teeth which spiral up the sides of the tool so they can remove work material in a side-to-side direction.  Accordingly, end mills cut in both the vertical

Ropers Majeski Kohn & Bentley
A Professional Corporation
Redwood City

1    and horizontal axis and, therefore, can be used to cut metal parts in all shapes and sizes. These

2    tools are used by manufacturers of countless products such as automobiles, airplanes, computers

3    and medical instruments.

4    16.    In the 1960's, the Weldon Tool Company produced a line of end mills known as

5    the "Ski-Kut" line. Weldon claimed the "Ski-Kut' line of end mills was protected by U.S. Patent

6    No. 3,003,224 for a cutting tool (the '224 or Ribich Patent). The '224 Patent was issued on

7    October 10, 1961, and was assigned to Weldon by its inventor, Thomas Ribich, a Weldon

8    engineer. (Attached hereto as Exhibit B.)

9    17.    The Ribich patent taught an end mill cutting tool with a fluted portion having

10    helical cutting teeth which were comprised of a cutting face wall on the inside and a peripheral

11    relief face wall on the outside. (Exhibit B, 5:41-53.)

12    18.    Weldon produced two different types of end mills in the Ski-Kut line; one was

13    called the SKB and the other was called the SKX. Both were made of high speed steel and were

14    designed particularly for milling aluminum.

15    19.    The SKB line was sharpened "up sharp" (i.e., without a circular land on the

16    peripheral cutting teeth) and the SKX line was manufactured with what is sometimes known as a

17    "circular land", "hairline" or "arcuate land."

18    20.    The concept of a circular land on end mills was a well-established design element

19    in the industry in the 1960's. The word "unrelieved" comes from the fact that end mills are

20    created from cylindrical blanks of whatever ferrous material the mill manufacturer decides to use

21    (e.g., high speed steel or tungsten carbide). If an end mill manufacturer desired to create an end

22    mill with a diameter of ½ inch, then the manufacturer would begin by using a cylindrical blank

23    with a precise outside diameter of ½ inch. The helical cutting teeth of the end mill (i.e., the

24    cutting teeth that spiral up the sides of the tool) are then created by grinding away or "relieving"

25    portions of the cylindrical blank. The cutting edge of the helical teeth can either be created by

26    removing material from the cylindrical blank at a precise or "sharp" angle to the cutting edge

27    (referred to as creating the cutting edge "up sharp") or the manufacturer can leave an extremely

28    narrow "unrelieved" section of the original cylindrical blank on the back side or peripheral wall

Ropers Majeski Kohn & Bentley
A Professional Corporation
Redwood City

1    immediately adjacent to the cutting edge and all along the cutting edge.  Accordingly, a

2    "cylindrical" or "arcuate" land was frequently created by simply leaving a .003 to .005 inch strip

3    along the back side of the cutting edge of the original cylindrical blank.

4         21.    On the SKX line of end mills, the circular land was specified to be between .003

5    and .005 inches wide and the SKX's were accepted or sold with circular lands between .002 and

6    .005 inches wide.

7         22.    Further, both the SKX and the SKB end mills had end cutting edges with end

8    concavity or "dish" that was in the range of approximately one-half of a degree to 5 degrees.  As

9    was true with the hairline, this amount of end concavity was a standard design feature of end

10   mills in the 1960's.  While they were part of the Ski-Kut line of tools, neither the hairline nor the

11   end dish were claimed as part of the '224 Patent.

12        23.    The Ribich patent itself did not specify the formation of a circular or arcuate land

13   on the peripheral relief face wall, nor did it teach that the end cutting edges of the tool were to

14   taper and meet at any particular angle to create a concave end on the tool.  These features,

15   however, were found on the Ski-Kut line of products and were the result of common accepted

16   practices in the cutting tool industry.

17        24.    Weldon's catalogs and internal newsletters described the features of the Ski-Kut

18   line.

19        25.    The 1965 edition of the Metal Cutting Tool Handbook specifically mentions that

20   end mills can be made with: (a) a hairline or .003 to .005 inch wide unrelieved or circular margin

21   on the side cutting teeth; (b) with end concavity between 1/2 degree to 5 degrees; and (c) out of

22   tungsten carbide.  It defines the term "cylindrical land" as "[a] narrow portion of the peripheral

23   land, adjacent to the cutting edge, having no radial relief."  (The Metal Cutting Handbook is

24   attached as Exhibit C, p. 19, 20 and 23.)  This is also known as a "margin."  (Exh. C, 20, 23, 30.)

25   Further, under a section dealing with relief angles and end mills, the Handbook states that when

26   cutters must mill to a given width, and where the maintenance of this width is important, "[a] very

27   slight land or margin (sometimes called a hairline) without relief is left on the side teeth at the

28   cutting edge.  The relief angle of 2 degree to 4 degree is ground back of this flat land, except on

Ropers Majeski Kohn & Bentley
A Professional Corporation
Redwood City

1    thin saws where the relief is increased to 3 degrees to 5 degrees." (Exh. C, 34-35.)  Various relief

2    angles are effective to alleviate excessive wear, heat and "chatter" (irregularity on the finish of

3    the workpiece). (Exh. C, 19, 34.)

4         26.    The 1965 edition of the Metal Cutting Tool Handbook also explains the

5    sharpening of the end cutting edges of end mills with a concave or dish end.  (Exh. C, 40-45.)  It

6    specifically provides that the end cutting teeth of end mills should be sharpened with an end

7    concavity of between 1/2 degree to 5 degrees. (Exh. C, 41-43, 45.)  The end "dish" is a common

8    practice in the industry since it helps remove chips of milled material and reduce the load on the

9    end mill while in use.

10        27.    Other end mill manufacturers also made use of these same features.  For example,

11   since the early 1980's Hannibal Carbide also incorporated these features in their cutting tools.

12   Hannibal manufactured end mills with circular lands measuring .002 to .003 inches in width and

13   an end concavity dish angle between 2 to 4 degrees.  Further, in 1988, Lexington Cutter,

14   Hannibal's sister company, manufactured carbide tipped end mills with a precise .002 to .003

15   inch wide circular margin or hairline.  These end mills also had an end concavity between 1 to 2

16   degrees.

17        28.    Robb Jack Corporation of Lincoln, California, has manufactured solid tungsten

18   carbide end mills since at least 1986.

19        29.    Pursuant to the patent term then in effect under 35 U.S.C. 154, the Ribich patent

20   expired on October 10, 1978, which was seventeen years from the date of its issue.

21        30.    Weldon, however, continued to advertise the Ski-Kut line of end mills as

22   "patented."

23        31.    SGS Tool Company of Munroe Falls, Ohio, manufactures and sells cutting tools

24   made of solid tungsten carbide and has done so since at least 1967.  Weldon, on the other hand,

25   did not manufacture end mills out of carbide because it lacked the capability.

26   **The Relationship Between Weldon and SGS and Their Duty of Candor to the Patent Office**

27        32.    After the Ribich patent had expired, in the late 1980's, Weldon and SGS began

28   collaborating on a joint venture that involved taking Weldon's existing Ski-Kut line of tools and

Ropers Majeski Kohn & Bentley
A Professional Corporation
Redwood City

1    manufacturing them in tungsten carbide. SGS' Chief Operating Officer, Graydon Beck,

2    approached Kenneth Skrabec, the executive vice president at Weldon Tool with the idea.

3        33.    On August 21, 1990, application number 570,427 (the "Application") for an

4    "Improved Cutting Tool" was filed with the United States Patent and Trademark Office. The

5    Application issued into Patent No. 5,049,009 (the `009 Patent) on September 17, 1991.

6        34.    Weldon and SGS' officers, employees, attorneys, assignors, and agents involved in

7    applying for and obtaining the '009 Patent (collectively "Applicants and Representatives") owed

8    a legal and ethical "duty of candor and good faith" to the Patent Office under the decisional law

9    of the United States and the regulations and procedures of the Patent Office, including

10    37 C.F.R. § 1.56(a).

11        35.    This "duty of candor and good faith" extended to all "[i]ndividuals associated with

12    the filing and prosecution of" the patent application that resulted in the '009 Patent. Pursuant to

13    37 C.F.R. § 1.56, the duty applied to the following individuals:

14        (1) Each inventor named in the application;

15        (2) Each attorney or agent who prepare[d] or prosecute[d] the application; [and]

16        (3) Every other person who [was] substantively involved in the preparation or

17            prosecution of the application and who [was] associated with the inventor, with

18            the assignee or with anyone to whom there [was] an obligation to assign the

19            application. (37 C.F.R. § 1.56(c).)

20        36.    The Applicants and Representatives who were under a duty of candor and good

21    faith to the Patent Office were the named inventors of the '009 Patent, the patent attorneys acting

22    on behalf of the named inventors, and Weldon and SGS in applying for and prosecuting the

23    application.

24        37.    The duty of candor and good faith owed by the Applicants and Representatives

25    included a continuing obligation, at all times during the pendency of the application for the '009

26    Patent, to disclose to the Patent Office all prior art known to be material to a pending application.

27        38.    The Applicants submitted a declaration and power of attorney to the Patent Office

28    in support of the application for the '009 Patent. The Declaration states that it was signed by the

RC1/437768.1/LD                                    - 7 -                            COMPLAINT
                                                                                    DEMAND FOR JURY

Ropers Majeski Kohn & Bentley
A Professional Corporation
Redwood City

1    named inventors Graydon Beck and Kenneth Skrabec on August 20, 1990.

2        39.    In the declaration, each of the inventors expressly "acknowledge[d] the duty to

3    disclose information which is known to me to be material to patentability in accordance with

4    Title 37, Code of Federal Regulations, Section 1.56(a)."

5        40.    Further, by signing, each inventor stated:

6            I hereby declare that all statements made herein of my own
        knowledge are true and that all statements made on information and
7            belief are believed to be true; and further that these statements were
        made with the knowledge that willful false statements and the like
8            so made are punishable by fine or imprisonment, or both, under
        Section 1001 of Title 18 of the United States Code and that such
9            willful false statements may jeopardize the validity of the
        application or any patent issued thereon.
10

11       41.    The application for patent was submitted by Mark A. Watkins, Registered Patent

12   Attorney # 33,813, Oldham & Oldham, 1225 West Market Street, Akron, Ohio, as the inventors'

13   representative.  Edwin W. Oldham was also listed as an approved attorney and agent for the

14   inventors.

15       42.    Although the inventors listed on the face of the '009 Patent are Graydon L. Beck,

16   Cuyahoga Falls, Ohio and Kenneth Skrabec of Medina, Ohio, the patent was assigned to The

17   Weldon Tool Company and SGS Tool Company during the prosecution of the patent.  Upon

18   information and belief, defendant Dauphin is the successor interest to The Weldon Tool

19   Company's share of ownership, through a series of assignments.

20   **The Prosecution of the '009 Patent**

21       43.    The application disclosed 16 claims for an improved rotary cutting end mill

22   summarized as "a novel end mill cutting tool."  The summary of the invention further states that

23   the end mill is to be made of tungsten carbide, something that "until now…was not thought

24   possible."

25       44.    To the contrary, a number of end mill manufacturers had been manufacturing end

26   mills out of various forms of carbide, including tungsten carbide since at least the early 1960s.

27   Defendant SGS had been doing so since 1967, but Weldon lacked the specific type of grinders

28   needed to do so at that time.

Ropers Majeski Kohn & Bentley
A Professional Corporation
Redwood City

45.     The application further explains that the invention:

> has one or more helical teeth, each helical tooth comprises a cutting
> surface and a peripheral relief wall which intersect to form an angle
> defining a helical cutting edge at the point of intersection, ...said
> peripheral relief wall having a first and second relief wall, said first
> relief wall originating at said helical cutting edge and having a
> generally arcuate land adjacent to said cutting edge which is
> substantially parallel to said circumferential cutting path....

46.     The claims explain that the arcuate land has a width, perpendicular to the cutting edge of about .003 to about .005 inches. Further, the cutting teeth at the terminal end of the end mill join at a center point and form an angle of about 177° to about 179.5°.

47.     In their original application, neither inventor disclosed the fact that the aforementioned design feature had been well known in the art for decades.

48.     On January 1, 1991, all 16 claims of the application were rejected. Among other reasons, claims 1-2, 4-6, 8-10, 12, 14-16 were rejected as being anticipated under 35 U.S.C. 102(b) by Ribich. Claims 3, 7, 11, 13 were rejected under 35 U.S.C. 103 as obvious and unpatentable over Ribich.

49.     The examiner stated:

> Ribich teaches everything except the specific dimensions of the
> land and the angle. However, it would have been obvious to one of
> ordinary skill in the art at the time the invention was made to
> provide the length of the arcuate land between .003 and .005 inches
> and an angle formed between the cutting edges at the terminal end
> of the end mill of between 177 to about 179.5 degrees to implement
> the Ribich tool effectively.

50.     In response to the rejection, the inventors filed an amendment on April 29, 1991. In it, the inventors withdrew several claims and addressed the examiner's argument that the claims were anticipated by and obvious over Ribich. The amendment states:

> Applicant acknowledges that U.S. patent 3,003,224 to Ribich
> discloses an end mill having the general elements found in the
> present invention. In fact, applicant cites and discussed Ribich in
> the background of the present application. Ribich does disclose a
> peripheral relief wall with a first and second back off surface.
> **However Ribich is devoid of a teaching regarding the formation
> of an arcuate land segment on the first back off surface,
> adjacent to the helical cutting edge as is found in the present
> invention.** Applicant has found that an arcuate land as described,
> serves to quiet the tool during operation, especially at high speeds
> and yields an improved surface finish on the workpiece.

Ropers Majeski Kohn & Bentley
A Professional Corporation
Redwood City

1    as patentable subject matter.

2        53.    Weldon and SGS and everyone involved on their behalf, specifically knew that

3    each of the three allegedly "novel" elements of the application were not, in fact, new.  Said

4    persons intentionally and in concert withheld and misrepresented the true facts in an effort to

5    improperly obtain a patent on technology that had been commonplace in the industry for decades.

6        54.    The receipt of this amendment was followed by two telephone interviews by the

7    examiner.  In these interviews, Edwin Oldham was the Applicants' representative.  The

8    examiner's notes for the May 21, 1991 interview state that agreement was not reached and "the

9    arcuate land segment of Claim 1 and 9 define over the applied art.  Claims 3 and 11 require

10    editorial correction.  The allowability of the taper angle range of claim 5 will be considered."

11        55.    A second telephone interview with Edwin Oldham on May 23, 1991, lead to an

12    agreement with respect to the claims.  Edwin Oldham authorized an examiner's amendment.

13        56.    The examiner's amendment, dated May 29, 1991, cancels claims 5, 8, and 18.  It

14    also adds two prior references relevant to the tapering of the end cutting edges and makes

15    editorial corrections to claims 3 and 11.

16        57.    A Notice of Allowance was issued on May 31, 1991.

17        58.    Following the notice of allowance, Supplemental Declarations for Amendment

18    Presenting Claims for Matter Disclosed But Not Originally Claimed were submitted by each

19    inventor.  Mr. Beck and Mr. Skrabec each signed the statements, each acknowledging his duty to

20    disclose information which is material to the examination of the Patent application, under 37

21    C.F.R. 156(a).

22        59.    In its issued form, the '009 Patent is made up of variations of three claimed

23    "improvements" to the design and makeup of "end mills."  First, with respect to the teeth that run

24    up the side of the end mill ("flutes"), plaintiffs claim that the addition of a barely-visible, 0.003 to

25    0.005 inch wide "cylindrical land" on the back side of the cutting edge "… serves to quiet the

26    tool, especially at the high speeds now possible, and yields an improved surface finish on the

27    workpiece." (Exh. A, Col. 4:29-31.)

28        60.    The second design improvement claimed by the '009 Patent is a slightly indented

Ropers Majeski Kohn & Bentley
A Professional Corporation
Redwood City

1   or "concave" angle of between 177 degrees to 179.5 degrees from horizontal axis "… has yielded

2   unexpected results regarding tooth life. The slight angular modification greatly reduces the

3   chipping to the end mill cutting teeth and reduces corner wear." (Exh. A, Col. 4:52-56.)

4        61.    The third "improvement" claimed by the '009 Patent is the use of a special type of

5   metal alloy – "Tungsten Carbide" – in the manufacture of the tool. According to the Patent,

6   "conventionally, these end mills are made from different types of hardened steel." (Exh. A, Col.

7   1:13-15.) Because it is made of Tungsten Carbide, the tool lasts longer than similar tools and it

8   can be used at higher cutting speeds than possible before. (Exh. A, 1:51-56.) Also according to

9   the Patent, "[f]or many years, it was not thought possible to manufacture such an end mill out of

10  Tungsten Carbide." (Exh. A, Col. 5:13-14.) In its Summary of the Invention, the '009 Patent

11  states, "Such an idea was not obvious to a number of carbide machinists although similar end

12  mills have been around for many years." (Exh. A, Col. 1:44-46.)

13       62.    With respect to the claims, all eight claims call out the 0.003-0.005 inch wide

14  circular land.

15       63.    As stated above, all three of these claimed "improvements" are found in the prior

16  art. The Applicants and Representatives, however, intentionally failed to disclose this prior art.

17  The features claimed in the '009 Patent were neither new nor novel and the Applicants knew it

18  and intentionally failed to disclose that fact.

19  **The Fraudulent Enforcement of the '009 Patent**

20       64.    After the '009 Patent was issued, SGS Tools manufactured the subject end mills

21  for sale by both Weldon and SGS. The line of end mills were named "Ski-Carb" and "Ski-Karb"

22  and were to be used for milling aluminum.

23       65.    Al Lolopolous, a quality control manager at Weldon Tool, testified that the only

24  difference between the Ski-Kut and Ski-Carb lines of tools is the material they are made from.

25  There were no other geometric differences.

26       66.    On October 8, 1996, Data Flute CNC, a Massachusetts based manufacturer of

27  carbide end mills, obtained an opinion as to the validity of the '009 Patent. The opinion stated

28  that the '009 Patent was invalid for a number of reasons including that it was anticipated by prior

Ropers Majeski Kohn & Bentley
A Professional Corporation
Redwood City

Ropers Majeski Kohn & Bentley
A Professional Corporation
Redwood City

1    art, that the invention was offered for sale more than one year before the application filing date

2    and that the inventors failed to disclose relevant prior art.  (Exhibit D.)

3        67.    On or about 1998, Talbot, the parent company of Weldon, purchased Data Flute

4    CNC.  On information and belief, as part of the sale, Data Flute's then President, David

5    McCulloch, turned over the invalidity opinion to Talbot.

6        68.    On March 4, 1998, Steve Swift, the President of Swift Tools and New Tech

7    Cutting Tools in Kent, Washington, received a letter from Mark Watkins of the law firm Oldham

8    and Oldham in Akron, Ohio regarding the '009 Patent.  Mr. Watkins stated that he was seeking

9    Swift's comments on whether Swift Tools' Swift-Carb product falls within the claims of the '009

10   Patent.  Watkins also requested a sample of the Swift-Carb.  (Exhibit E.)

11       69.    In response to telephone conversations with Watkins, Swift stopped making and

12   selling the Swift-Carb product, out of fear of being sued for patent infringement.

13       70.    After reviewing the '009 Patent, Swift became convinced that the '009 Patent was

14   identical to Weldon's tools that he had worked with 20 years ago.  He composed a letter to his

15   attorney, Roy Mattern, about his observations.  He stated that the patent claims are identical to the

16   prior art and "[a]s you can see, this is nothing more than a very creative rewrite of an old patent

17   and never should have been reissued..." (Exhibit F.)

18       71.    In a phone conversation with Watkins, Swift explained that he felt the '009 Patent

19   was identical to and a mirror image of the tools Weldon had been making for 20 years.  Swift told

20   Watkins he felt the '009 Patent had been fraudulently obtained and Watkins and his clients were

21   "strong arming people like me, scaring the hell out of us, you're causing us to lose money, you're

22   causing us to hire attorneys."  Further, he told Watkins he felt Watkins and his clients were

23   "making millions and million and millions of dollars from all the end customers because under

24   the pretense that you've got a valid patent."  Finally, Swift told him that if Watkins and his clients

25   sued him for infringement, he would show the judge "my three inches of paperwork" which was

26   prior art that would show the '009 was invalid.  Watkins left Swift alone after that.

27       72.    After his conversation with Watkins, Swift also called Robert McKay[1], who he

28

---

[1] Robert McKee was the president of Talbot Industries, the parent company of Weldon, at that time.

RC1/437768.1/LD                              - 13 -                              COMPLAINT
                                                                                DEMAND FOR JURY

believed was the president of Weldon, and told him that the patent was invalid and Watkins' behavior would get Weldon "in big trouble." McKay told Swift he was unaware of the details since he "just got here." Swift advised him to look into it. He heard no more from Weldon on the issue.

73.    On December 17, 2003, Swift received another similar demand letter from Mark Watkins, of the law firm of Hahn, Loeser and Parks (formerly named Oldham & Oldham). The letter was directed to the President of New Tech Tools.

74.    The letter followed news that Bombardier Aerospace, who planned to purchase a large number of New Tech cutting tools from one of New Tech's distributors, had pulled out of the purchase. Swift learned that Bombardier did not go through with the purchase because it had been threatened by SGS and Weldon representatives that if it went through with the purchase, New Tech would not be able to deliver the tools because Weldon and SGS would enforce their patent.

75.    Just as he had done five years earlier, Swift called Watkins and told him "the same thing I told him last time." After Swift reminded Watkins that Watkins did not want Swift telling anybody what he knew about the '009 Patent, Swift challenged him to file suit. Swift did not hear again from Watkins.

76.    In February 2003, Destiny published its catalog showing its "Viper" line of end mills and their three tooth face geometry.

77.    On June 9, 2003, plaintiff Destiny received a demand letter from Mark Watkins of Hahn, Loeser and Parks, claiming possible infringement of U.S. Patent 5, 049, 009 and by the Destiny Tool Viper line of end mills. (Exhibit G.)

78.    On August 23, 2003, Guy Calamia, the President of Destiny Tool, discussed the allegedly infringing Viper with Watkins via telephone. Calamia informed Watkins that a provisional patent application had been filed for the Viper, and Watkins verbally admonished him for doing so.

79.    In November 2003, in an effort to show SGS that the Viper did not infringe the '009 Patent, Calamia sent SGS and Dauphin samples of the Viper and the Viper's promotional

Ropers Majeski Kohn & Bentley
A Professional Corporation
Redwood City

1    material.

2    80.    In addition, Dauphin suggested to Calamia that Dauphin has a pending patent

3    application which would also further cover the manufacture and sale of Destiny's products in the

4    U.S., and that, upon the issuance of said application as a patent, said patent also would be asserted

5    against Destiny.

6    81.    On July 13, 2004, SGS and Dauphin instituted a civil action against Destiny in the

7    United States District Court of Court of the Northern District of Ohio.  The complaint alleged

8    Destiny infringed the '009 Patent and claimed damages.  The underlying infringement action was

9    entitled "SGS Tools Company and Dauphin Precision Tool, LLC, Plaintiffs, v. Step Tools

10    Unlimited, Inc. d/b/a Destiny Tool, Defendant," Case No.5:04 CV1315.  (Exhibit H.)

11    82.    Destiny filed a counterclaim for declaratory judgment that the '009 Patent was

12    invalid.

13    83.    In July 2004, Guy Calamia learned that, because of the lawsuit with SGS and

14    Dauphin, one of Destiny's distributors, Western Cutting Tool in Oregon, would no longer support

15    Destiny.

16    84.    Also in July 2004, Destiny's Northern California Manufacturing Representative,

17    Mike Blodget, resigned and went to work for Dauphin.

18    85.    Throughout August 2004, Destiny learned that representatives of SGS were

19    informing end users and distributors of the lawsuit in an apparent effort to damage Destiny's

20    reputation and sales.

21    86.    In November 2004, Frank Calamia, the Vice President of Destiny Tool met

22    personally with Tom Haag, in an effort to resolve the dispute between the companies.  Frank

23    Calamia compared the Viper 2 Flute and 3 Flute to the '009 Patent.  He also discussed the

24    similarities between the Weldon SKI-CUT SKX and SGS/Weldon SKI-CARB as well as the

25    relationship between the Ribich patent and the '009 Patent.  Mr. Haag told Frank Calamia that

26    that the only way to bring the lawsuit to an end is for Destiny to stop making the Viper line.

27    87.    In August 2005, Destiny discovered that its manufacturing sales representative for

28    Washington and Oregon was also working in the same capacity for Dauphin Precision.  Destiny's

Ropers Majeski Kohn & Bentley
A Professional Corporation
Redwood City

1    sales in that territory had dropped.  On information and belief, this manufacturing representative

2    was recruited in November 2004 by Dauphin representatives so that Dauphin could obtain

3    competitive information about Destiny.

4         88.      Further, in an effort to increase Destiny's legal costs, defendants engaged in

5    abusive and obstructionist discovery practices.  For example, defendants served 1,656 requests for

6    admissions on Destiny.  Further, despite the fact Destiny demanded copies of Weldon's design

7    specifications for the Ski-Cut line of tools, defendants refused to produce the same.

8         89.      After extensive discovery, including several depositions, on September 15, 2005,

9    Destiny filed a motion for summary judgment on its counterclaim for declaratory judgment that

10   the '009 Patent was invalid.  The motion was based on evidence, as noted above, of the

11   nondisclosure of relevant prior art during the prosecution of the '009 Patent.

12        90.      The same day, SGS and Dauphin moved to voluntarily dismiss their infringement

13   action with prejudice.  Concurrently, they unilaterally gave Destiny a covenant that they would

14   never sue Destiny for infringement of the '009 Patent and they moved to dismiss Destiny's

15   counterclaim for declaratory relief on the grounds that, after voluntary dismissal of the

16   infringement claim, there would no longer be a case and controversy, and the Court would then

17   lack subject matter jurisdiction over the counterclaim for invalidity.

18        91.      Despite Destiny's opposition to the dismissal, on September 29, 2006, the Court

19   granted SGS and Dauphin's motion to voluntarily dismiss its infringement claim with prejudice.

20   The Court also dismissed Destiny's counterclaim for declaratory judgment of invalidity without

21   prejudice. (Exhibit I.)

22                    **FIRST CLAIM FOR RELIEF**

23           **Malicious Prosecution of the Patent Infringement Lawsuit**

24        92.      Destiny realleges and incorporates by reference paragraphs 1 through 91, as set forth

25   in this complaint.

26        93.      Defendants intentionally failed to disclose all relevant prior art during the

27   prosecution of the '009 Patent, despite knowing or having reason to know of the relevant prior

28   art.  Such actions violated their duty of candor owed to the Patent Office and constituted fraud in

Ropers Majeski Kohn & Bentley
A Professional Corporation
Redwood City

1    the prosecution of the application.

2    94.    Defendants, on several occasions, were confronted with the relevant prior art after

3    the issue of the '009 Patent. Defendants knew or had reason to know of the relevant prior art, and

4    therefore knew of the '009 Patent's invalidity, or had reason to doubt its validity.

5    95.    Despite this knowledge or reason to know the '009 Patent was invalid,

6    unenforceable and not infringed, on July 13, 2004, defendants instituted a civil action against

7    Destiny in the United States District Court for the Northern District of Ohio. The complaint

8    alleged Destiny infringed the '009 Patent and claimed damages. The underlying infringement

9    action was entitled "SGS Tools Company and Dauphin Precision Tool, LLC, Plaintiffs v. Step

10   Tools Unlimited, Inc. d/b/a Destiny Tool, Defendant," Case No. 5:04 CV1315.

11   96.    Because defendants knew or had reason to know the '009 Patent was invalid, their

12   infringement suit was asserted in bad faith. No reasonable litigant in defendants' position would

13   have objectively or subjectively believed in the merits of the lawsuit.

14   97.    To the contrary, with specific knowledge that the '009 Patent was obtained

15   through fraud and that the patent was invalid, defendants, and each of them, filed the underlying

16   infringement action to illegally harm Destiny and to obtain a further illegal monopoly in the end

17   mill industry.

18   98.    In the underlying action, Destiny filed a counterclaim requesting declaratory relief

19   that the '009 Patent was invalid.

20   99.    After extensive discovery, including several depositions, in the conduct of the

21   underlying lawsuit, on September 15, 2005, Destiny filed a motion for summary judgment on its

22   counterclaim for declaratory relief that the '009 Patent was invalid. The same day, SGS and

23   Dauphin moved to voluntarily dismiss their infringement action with prejudice and to dismiss

24   Destiny's counterclaim for declaratory relief on the grounds that after voluntary dismissal, there

25   would no longer be a case and controversy, and thus the court would lack subject matter

26   jurisdiction over the counterclaim for invalidity.

27   100.    Despite Destiny's opposition to the dismissal because it had a pending motion for

28   summary judgment on its counterclaim for invalidity, on September 29, 2006, the Court granted

Ropers Majeski Kohn & Bentley
A Professional Corporation
Redwood City

COMPLAINT
DEMAND FOR JURY

1   SGS and Dauphin's motion to voluntarily dismiss its infringement claim with prejudice. The

2   Court also dismissed Destiny's counterclaim for declaratory judgment of invalidity without

3   prejudice.

4        101.    The termination of the lawsuit was favorable to Destiny as it disposed of the

5   infringement claim, although it did not provide Destiny the entire sum of its requested relief.

6        102.    Defendants, and each of them, acted without probable cause in bringing the above-

7   mentioned action in that they did not honestly and reasonably believe that there were grounds for

8   the infringement action because they knew, based on their conduct before the USPTO and

9   subsequent confrontations, their patent was obtained through fraudulent representations to the

10   USPTO.

11        103.    Defendants, and each of them, acted maliciously in bringing the above-mentioned

12   action against Destiny in that they specifically targeted Destiny in an improperly motivated and

13   malicious attempt to extract a monetary settlement and injure Destiny and eliminate it as a

14   competitor.

15        104.    As stated above, because defendants knew the '009 Patent was invalid and

16   unenforceable, their unsuccessful patent infringement action was objectively and subjectively

17   baseless, and it was therefore undertaken in bad faith.

18        105.    As a proximate result of defendants bringing the above-mentioned action against

19   Destiny, Destiny has been damaged in excess of $2,000,000.

20        106.    As a further proximate result of the action initiated by defendants, Destiny

21   incurred costs in excess of $30,000 and the sum of $200,000 as attorney's fees in defending

22   against the underlying baseless action.

23        107.    At all times mentioned herein, defendants acted willfully with the wrongful

24   intention of injuring plaintiff amounting to malice in that it purposely sought to damage Destiny's

25   business reputation and goodwill because it is a competitor.

26        108.    Defendants have engaged in such tortious interference willfully, wantonly,

27   maliciously and in total disregard of Destiny Tool's rights and have caused Destiny to suffer

28   losses in an amount that has yet to be determined but will be established at trial.

Ropers Majeski Kohn & Bentley
A Professional Corporation
Redwood City

Ropers Majeski Kohn & Bentley
A Professional Corporation
Redwood City

1

## SECOND CLAIM FOR RELIEF

2

### Abuse of Process

3      109.    Destiny realleges and incorporates by reference paragraphs 1 through 108, as set

4  forth in this complaint.

5      110.    On July 13, 2004, SGS and Dauphin instituted a civil action against Destiny in the

6  United States District Court for the Northern District of Ohio.  The complaint alleged Destiny

7  infringed the '009 Patent and claimed damages.  The underlying infringement action was entitled

8  "SGS Tools Company and Dauphin Precision Tool, LLC, Plaintiffs v. Step Tools Unlimited, Inc.

9  d/b/a Destiny Tool, Defendant," Case No.5:04 CV1315.

10     111.    As stated above, because defendants had no reasonable belief in the merits of the

11  litigation, defendants misused the litigation as a tool to damage Destiny's good business

12  reputation and damage Destiny's finances by incurring legal costs for the purpose of driving

13  Destiny from the market for high speed end mills used to shape aluminum.  Further, the litigation

14  was used as a tool of intimidation and as part of defendants' efforts to monopolize the market for

15  high speed end mills used to shape aluminum.  These uses of the patent litigation process and the

16  resources of the United States District Courts were not authorized in the regular course of the

17  proceeding.

18     112.    The ulterior purpose and motivation of defendants in so misusing the process in

19  the above-described manner was to obtain the following collateral advantage over Destiny by

20  forcing Destiny from the market for high speed end mills used to shape aluminum.  Further, with

21  specific knowledge that the '009 patent was obtained through fraud and that the patent was

22  invalid, defendants, and each of them, filed the underlying infringement action to illegally harm

23  Destiny and to obtain a further illegal monopoly in the end mill industry.

24     113.    As a proximate result of these actions Destiny has been damaged generally.

25     114.    At all times mentioned herein, defendants acted willfully with the wrongful

26  intention of injuring Destiny and from an improper or evil motive amounting to malice in that

27  SGS and Dauphin specifically sought to cause damage to Destiny and eliminate Destiny as their

28  competition.

115.    Defendants have engaged in this tortious activity willfully, wantonly, maliciously and in total disregard of Destiny's rights which have caused Destiny to suffer losses in an amount that has yet to be determined but will be established at trial.

### THIRD CLAIM FOR RELIEF

**Monopolization in Violation of Section 2 of the Sherman Antitrust Act**

116.    Destiny realleges and incorporates by reference paragraphs 1 through 115, as set forth in this complaint.

**Interstate Commerce**

117.    Defendants have substantially affected interstate commerce by illegally monopolizing, and attempting to monopolize, the relevant market, as alleged below.

118.    From approximately 1988, through the present (the "relevant time period"):

    a.    Defendants, and each of them, manufactured, sold and distributed substantial numbers of end mill cutting tools in a continuous and uninterrupted flow of commerce across state lines and throughout the United States;

    b.    Defendants, and each of them, solicited and entered customers, and promoted its cutting tools over the Internet, across state lines, using the United States mails and using interstate telephone lines; and

    c.    Defendants, and each of them, employed the Internet, interstate telephone lines, and the United States mails in furtherance of its monopolization and attempt to monopolize the relevant market, as alleged below.

**Relevant Market**

119.    The relevant product market with respect to Destiny's third and fourth counts is the market for high speed end mills used to shape aluminum. The relevant geographical market is the United States.

120.    Destiny is informed and believes and thereon alleges that, throughout the relevant time period up to and including the present, defendants have had market power in the relevant product and geographical markets.

Ropers Majeski Kohn & Bentley
A Professional Corporation
Redwood City

1    121.    Destiny is informed and believes and thereon alleges that defendants' share of the

2    relevant product and geographical markets together exceeds 65%.

3    122.    Destiny is informed and believes and thereon alleges that Defendants have

4    engaged in monopolization in the relevant market during the relevant time period, in violation of

5    Section 2 of the Sherman Antitrust Act.  Destiny is informed and believes and thereon alleges that

6    Defendants' acts of unlawful monopolization have included procuring the '009 Patent by

7    knowing and willful fraud and baselessly asserting them in bad faith in sham litigation against

8    Destiny.

9    123.    Destiny is informed and believes and thereon alleges that the knowing and willful

10   fraud by defendants and its Applicants and Representatives in procuring the '009 Patent has

11   included all of their deceitful conduct alleged above, including:

12       a.    The inventors of the '009 Patent were aware of their duty to disclose

13           known material prior art, implicitly also representing that they had

14           complied with or would comply with this duty;

15       b.    The intentional and fraudulent concealment from the Patent Office by the

16           Applicants and Representatives that, despite their well-established and

17           acknowledged duty of candor and good faith, they had no intention of

18           disclosing, and had not disclosed, all known material prior art;

19       c.    The intentional and fraudulent concealment from the Patent Office by the

20           Applicants and Representatives of known, material prior art, as alleged

21           above; and

22       d.    Their intentional and fraudulent concealment from the Patent Office of the

23           deceptive scheme in which they were engaged in applying for and

24           obtaining the '009 Patent, as alleged above.

25   124.    Destiny is informed and believes and thereon alleges that defendants, the

26   Applicants and Representatives, in applying for the '009 Patent and, at all times thereafter,

27   through the issuance of the '009 Patent, intentionally, fraudulently and materially deceived the

28   Patent Office in knowing violation of their legal and ethical duties of candor and good faith to the

Ropers Majeski Kohn & Bentley
A Professional Corporation
Redwood City

1  Patent Office as alleged above.

2      125.    Destiny is informed and believes and thereon alleges that, in making and

3  submitting the declarations and representations referred to above, and in concealing and failing to

4  disclose the material prior art and other material facts referred to above, the defendants'

5  Applicants and Representatives intended to deceive the Patent Office and intended, by such fraud

6  and deception, to obtain a patent to which they were not otherwise entitled.  In the alternative,

7  Destiny is informed and believes and thereon alleges that defendants' Applicants and

8  Representatives intentionally disregarded their obligations to the Patent Office with a state of

9  mind so reckless with respect to the consequences of their conduct that it was the legal equivalent

10  of expressly fraudulent intent.

11      126.    Destiny is informed and believes and thereon alleges that, in issuing the '009

12  Patent, the Patent Office justifiably relied on the foregoing misrepresentations, concealment, and

13  omissions of material prior art and other material facts by Applicants and Representatives and

14  that the Office would not otherwise have issued those patents.

15      127.    Destiny is informed and believes and thereon alleges that defendants know of the

16  fraudulent origin, invalidity, and unenforceability of the '009 Patent and that, in asserting the

17  patent against Destiny – as well as in any other past, present or future attempts to enforce the

18  patent – defendants have been, and will be acting with full knowledge of the patent's fraudulent

19  origin, invalidity, and unenforceability.

20      128.    Destiny is informed and believes and thereon alleges that defendant SGS and

21  Dauphin Precision Tool's infringement lawsuit against Destiny was a sham and was both

22  objectively and subjectively baseless for reasons including the suit's lack of any reasonable merit,

23  and defendants' lack of any probable cause for bringing it, in view of, without limitation, the clear

24  invalidity and unenforceability of the patents as alleged above, all of which is known to

25  defendants.

26      129.    Destiny is informed and believes and thereon alleges that defendants, in filing that

27  lawsuit and in prosecuting that lawsuit up to the date it was voluntarily dismissed, acted in bad

28  faith, as a mere sham, and without belief in the merits of its claims.  Destiny is informed and

Ropers Majeski Kohn & Bentley
A Professional Corporation
Redwood City

1    believes and thereon alleges that defendants used that lawsuit to conceal an attempt to directly

2    interfere with Destiny's business relationships and business, to extract a monetary settlement from

3    Destiny, to monopolize the relevant market, and to conceal by deceit, the defendants' attempt at

4    that monopoly.

5        130.    As examples of defendants' bad faith, Destiny is informed and believes and

6    thereon alleges that, at the time of filing this lawsuit, defendants knew:

7            a.    That the '009 Patent was and is invalid because its claims were anticipated

8                by and obvious in view of prior art that defendants failed to disclose to the

9                Patent Office during the pendency of the application for the '009 Patent;

10                and,

11            b.    The '009 Patent was and is unenforceable because defendants' Applicants

12                and Representatives withheld known, material prior art from the Patent

13                Office in prosecuting the application that resulted in the '009 Patent.

14        131.    Destiny is informed and believes and thereon alleges that defendants have used

15    their '009 Patent and the sham infringement litigation against Destiny to restrain competition by,

16    without limitation, attempting to induce Destiny to leave the relevant market, attempting to

17    damage Destiny's ability to compete in the relevant market, and attempting to deter other

18    potential competitors from entering the market.

19        132.    Destiny is informed and believes and thereon alleges that defendants have

20    succeeded in restraining competition in the relevant market during the relevant time period by

21    fraudulently obtaining and asserting the '009 Patent and by filing and prosecuting its sham

22    infringement litigation against Destiny.  Defendants' monopolistic conduct as alleged herein has

23    already harmed competition by causing Destiny to devote substantial resources to the defense of

24    this patent infringement action.  Destiny is informed and believes and thereon alleges that

25    defendants monopolistic conduct is further harming, or will further harm, competition by

26    deterring other potential competitors from entering the relevant market.

27        133.    As a direct and proximate result of defendants' acts of monopolization, Destiny

28    has suffered damages including attorneys' fees and litigation expenses required to defend against

Ropers Majeski Kohn & Bentley
A Professional Corporation
Redwood City

1  defendants' sham infringement lawsuit.  Destiny is informed and believes and thereon alleges that

2  other damages directly and proximately resulting from defendants' monopolistic conduct include

3  lost profits and lost goodwill sustained by Destiny as well as harm to other competitors or would-

4  be competitors in the relevant market.  Destiny is informed and believes and thereon alleges that

5  it and others will suffer additional such damages in the future if defendants continue their

6  monopolistic conduct, including their assertion of a fraudulently obtained patent and their sham

7  litigation.

8  ### FOURTH CLAIM FOR RELIEF

9  **Attempted Monopolization in Violation of Section 2 of the Sherman Antitrust Act**

10  134.    Destiny realleges and incorporates by reference paragraphs 1 through 133, as set

11  forth in this complaint.

12  135.    Destiny is informed and believes and thereon alleges that defendants have

13  attempted to monopolize the relevant market during the relevant time period, in violation of

14  Section 2 of the Sherman Antitrust Act.  Destiny is informed and believes and thereon alleges that

15  defendants' acts of attempted monopolization have included procuring the '009 Patent by

16  knowing and willful fraud and baselessly asserting it in bad faith in sham litigation against

17  Destiny.

18  136.    Destiny is informed and believes and thereon alleges that, in fraudulently

19  obtaining and asserting the '009 Patent as alleged herein, defendants have acted with the specific

20  intent to monopolize the relevant market.

21  137.    Destiny is informed and believes and thereon alleges that, in filing and prosecuting

22  its sham infringement litigation against Destiny as alleged herein, defendants have acted with the

23  specific intent to monopolize the relevant market.

24  138.    Destiny is informed and believes and thereon alleges that defendants' attempts to

25  monopolize the relevant market, as alleged herein, have had and now have a dangerous

26  probability of success.

27  139.    Destiny is informed and believes and thereon alleges that defendants have had

28  market power in the relevant product and geographical markets, throughout the relevant time

Ropers Majeski Kohn & Bentley
A Professional Corporation
Redwood City

Ropers Majeski Kohn & Bentley
A Professional Corporation
Redwood City

1    period or, in the alternative, that defendants have a dangerous probability of success of obtaining

2    such market power.

3        140.    Destiny is informed and believes and thereon alleges that, if successful,

4    defendants' monopolistic conduct as alleged herein would harm competition in the relevant

5    market by depriving consumers of the increased output, broader choice, and lower prices that

6    would result from competition on the merits.

7        141.    Destiny is informed and believes and thereon alleges that, if defendants succeeded

8    in their attempt to cause Destiny to exit from the relevant market because of fraudulently obtained

9    patents and sham litigation, defendants together would be closer to obtaining a virtually complete

10   monopoly in the relevant market.

11       142.    As a direct and proximate result of defendants' acts of attempted monopolization,

12   Destiny has suffered damages including, without limitation, attorneys' fees and litigation

13   expenses required to defend against defendants' infringement lawsuit.  Destiny is informed and

14   believes and thereon alleges that other damages directly and proximately resulting from

15   defendants' acts of attempted monopolization include lost profits and lost goodwill sustained or to

16   be sustained by Destiny as well as harm to other competitors or would-be competitors in the

17   relevant market.

18       WHEREFORE, Plaintiff Destiny Tool prays for judgment as follows:

19       1.    As to Counts I and II:

20           a.    For general damages according to proof.

21           b.    For punitive damages.

22           c.    For costs of suit herein incurred.

23           d.    For such other and further relief as the Court may deem meet and proper in

24              the premises.

25       2.    As to Count III, and IV:

26           a.    For actual damages, according to proof, trebled pursuant to law;

27           b.    For their costs of suit; including reasonable attorneys fees;

28           c.    For an injunction restraining Defendants' threats of instituting or institution

1    of any litigation alleging infringement of the '009 patent or pending patent

2    claims of Defendants as against Plaintiff and Plaintiff's customers;

3        d.    For such other and further relief as the court may deem meet and proper in

4    the premises.

5    Dated: June 13, 2007            ROPERS, MAJESKI, KOHN & BENTLEY

6

7

8    By:_____
        ROBERT P. ANDRIS

9            LAEL D. ANDARA
        Attorneys for Plaintiff

10           DESTINY TOOL, a California corporation

11

12   **DEMAND FOR JURY**

13   Plaintiff hereby demands a trial by jury.

14   Dated: June 13, 2007            ROPERS, MAJESKI, KOHN & BENTLEY

15

16   By:_____
        ROBERT P. ANDRIS

17           LAEL D. ANDARA
        AMY K. GRUBER

18           Attorneys for Plaintiff

19           DESTINY TOOL, a California corporation

20

21

22

23

24

25

26

27

28

Ropers Majeski Kohn & Bentley
A Professional Corporation
Redwood City

RC1/437768.1/LD

COMPLAINT
DEMAND FOR JURY