**EXHIBIT 1**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| SGS TOOLS CO., et al., | ) | CASE NO.:  5:04CV1315 |
| | ) | |
| Plaintiffs, | ) | JUDGE JOHN ADAMS |
| | ) | |
| v. | ) | **ORDER AND DECISION** |
| | ) | |
| STEP TOOLS UNLIMITED, INC., d/b/a | ) | |
| DESTINY TOOL, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This matter comes before the Court on Motion by Plaintiffs SGS Tools Company and Dauphin Precision Tool, LLC, to dismiss their complaint with prejudice and to dismiss Defendant Step Tools Unlimited, Inc.'s counterclaim for lack of declaratory judgment jurisdiction.  Defendant has filed an opposition to the motion and requests that this Court rule on its motion for summary judgment regarding the validity of Plaintiffs' patent.  The Court notes that Defendant's counterclaim only requests a declaratory judgment of patent invalidity and makes no other requests for relief.

Under the Declaratory Judgment Act of 1934, in order for a district court to have jurisdiction over a claim for declaratory judgment, there must be a controversy between the parties that is appropriate for judicial determination. *Aetna Life Ins. Co. of Hartford, Conn., v. Haworth,* 300 U.S. 227, 240 (1937).  The controversy must be one that is "definite and concrete, touching the legal relations of parties having adverse legal interests." *Id.,* 240-41.  The determination of whether an actual controversy exists is a question of law. *Shell Oil Co. v. Amoco Corp.,* 970 F.2d 885, 888 (Fed. Cir. 1992).

In cases involving the declaration of patent rights, there is a two-point test set out in *BP Chems. Ltd. v. Union Carbide Corp.*, 4 F.3d 975, 978 (Fed. Cir. 1993), which states, "[t]here must be both (1) an explicit threat or other action by the patentee, which creates a reasonable apprehension on the part of the declaratory plaintiff that it will face an infringement suit, and (2) present activity which could constitute infringement or concrete steps taken with the intent to conduct such activity." *BP Chems.*, 4 F.3d at 978. The purpose of this test is to determine whether there exists a real and immediate need for a court to address the issue or if the threat is prospective and uncertain to occur. *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 239-41 (1937). Additionally, the controversy must exist not only at the time of filing the action but also "at all stages of review." *Preiser v. Newkirk*, 422 U.S. 395, 401 (1975). Once challenged, the burden to demonstrate that jurisdiction exists falls on the party asserting the declaratory judgment claim. *Super Sack Manufacturing Corp. v. Chase Packaging Corp.*, 57 F.3d 1054, 1058 (Fed. Cir. 1995). When deciding the issue, a district court must look to the totality of the circumstances. *Maryland Casualty Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 273 (1941).

Plaintiff cites to *Super Sack* in support of their motion to dismiss the counterclaim. In *Super Sack*, the plaintiff unconditionally agreed to not sue the defendant for infringement in its filings to the court and moved to dismiss the defendant's declaratory judgment action for patent invalidity based on a lack of a justiciable controversy. *Super Sack*, 57 F.3d at 1058. The court stated that "to establish jurisdiction over its declaratory judgment action [the defendant must demonstrate that the claim] existed at, and has continued since, the time the [counterclaim] was filed." *Id.*, at 1058

(internal quotations and citations omitted).  The court further held that "a patentee defending against an action for a declaratory judgment of invalidity can divest the trial court of jurisdiction over the case by filing a covenant not to assert the patent at issue against the putative infringer with respect to any of its past, present, or future acts . . . ." *Id.*  The declaratory judgment claim was found to be properly dismissed for lack of an actual controversy. *Id.*

In the case at bar, Plaintiffs have stated that "they will not assert U.S. Patent No. 5,049,009 against Defendant with respect to any past, present, or future acts" and dismissed with prejudice their action for infringement.  (Doc. #34, p. 1).  Additionally, in the opposition, Defendant appears to admit that Plaintiff's Motion divests the Court of jurisdiction when it stated, "Destiny's counterclaim (as currently pled cannot stand on its own for independent adjudication . . . ." (Doc. #42, p. 10).  Therefore, based on the court's holding in *Super Sack* and by Defendant's own admission, it appears that Plaintiffs have divested this court of declaratory jurisdiction by removing the controversy.

Defendant claims, however, that the action should not be dismissed based on Fed. R. Civ. P. 41 because: (1) the counterclaim was filed prior to the motion to dismiss; and (2) it objects to the dismissal.  Rule 41(a)(2) states:

> Except as provided in paragraph (1) of this subdivision of this rule, an action shall not be dismissed at the plaintiff's insistence save upon order of the court and upon such terms and conditions as the court deems proper.  If a counterclaim has been pleaded by a defendant prior to the service upon the defendant of the plaintiff's motion to dismiss, the action shall not be dismissed against the defendant's objections unless the counterclaim can remain pending for independent adjudication by the court.  Unless otherwise specified in the order, a dismissal under this paragraph is without prejudice.

Defendant cites to *Lackner Co. v. Quehl Sign Co.,* 145 F.2d 932 (6th Cir. 1944), in

support of its argument.  In *Lackner,* the plaintiff offered in open court to give the

defendant a free paid-up license under the patent and consented to dismissal of the

complaint and counterclaim with prejudice.  *Id.* at 933.  The court found that dismissal

was not appropriate based upon Rule 41.  *Id.* at 934.  In the present action, no license was

offered.  Plaintiffs made a covenant that they would not assert the patent against the

Defendant for any past, present or future acts.  Therefore, the instant case is factually

distinguishable from *Lackner.*  Additionally, the question of whether this Court has

jurisdiction is one of Constitutional dimension and cannot be trumped by the Federal

Rules.  *Ciber, Inc. v. Ciber Consulting, Inc.,* 326 F.Supp.2d 886, 892 (N.D. Ill. 2004).  To

construe Rule 41 in such a manner "would conflict with the mandates of Article III."  *Id.*

Defendant also argues that the action should not be dismissed because it would

suffer prejudice due to the length of time the action has been pending and the money that

has been expended in defending the infringement action.  However, Defendant cites to no

controlling case law that supports the proposition that this would create an exception to

the above rule.  As such, its argument is without merit.

Defendant lastly argues that if the Court were to grant Plaintiffs motions, it should

impose condition that "are just," such as entering judgment on Plaintiffs' claims for

Defendant, awarding costs and attorney fees, require Plaintiff to provide a written

covenant not to sue, and grant judgment for Defendant on its counterclaim or allow it to

amend the claim to assert a claim that would not be barred.  The Court, however, finds

that it may not grant judgment for the Defendant on either claim because it has been

stripped of subject-matter jurisdiction for lack of an actual controversy as stated above.

Also, because Plaintiffs have made a covenant not to assert the patent against the

Defendant through its attorneys in a filing before this Court, they are prevented by the

doctrines of collateral estoppel and *res judicata* from asserting such a claim against

Defendant in the future.  Additionally, the awarding of costs and attorney fees is at the

discretion of this Court and, without a judgment in favor of the Defendant, it cannot be

found to be a prevailing party in this action.  Thus, attorney fees and costs would be

inappropriate at this time.   Finally, because the action has been pending for over two

years, Defendant has had ample opportunity to amend the counterclaim to assert a claim

other than one for declaratory judgment and has chosen not to do so within the time

allotted by this Court.  It is noted that Defendant's opposition states that it discovered

evidence of other claims it could make against Plaintiff during discovery from January

through July of 2005.  The Court finds that, at this time, it would be inappropriate to

allow an amendment to be made.

   Based on the above, the Court DISMISSES Plaintiffs' Complaint with prejudice

and DISMISSES Defendant's counterclaim without prejudice.  The above action is

therefore dismissed in its entirety.

   So ordered.


                                    *s/ Judge John R. Adams*
                                    JUDGE JOHN R. ADAMS
   Date: September 29, 2006          UNITED STATES DISTRICT COURT

**EXHIBIT 2**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| SGS TOOLS COMPANY<br>55 South Main Street<br>Munroe Falls, Ohio 44262,<br><br>and<br><br>DAUPHIN PRECISION TOOL, LLC<br>200 Front Street<br>Millberg, PA 17061,<br><br>          Counterclaimants,<br><br>   v<br><br>STEP TOOLS UNLIMITED, INC. d/b/a<br>DESTINY TOOL<br>3232 De La Cruz Blvd., #C<br>Santa Clara, CA 95054,<br><br>         Defendant. | CASE NO.  5:04 CV1315<br><br>**JUDGE: JOHN R. ADAMS**<br><br>  [ PROPOSED ]<br><br>**AMENDED COUNTERCLAIM FOR:**<br><br>1    **Declaratory Relief (28 U.S.C. 2201)**<br>2    **Violations of Section Two of the**<br>       **Sherman Act (15 U.S.C. § 2);**<br><br>3    **Violations of RICO (18 U.S.C.**<br>       **§1962(c));**<br><br>4    **Violations of the Ohio Unfair**<br>       **Competition Law (§4165.2)**<br><br>5    **False Marketing (35 U.S.C. § 292)** |

STEP TOOLS UNLIMITED, INC. d/b/a
DESTINY TOOL
3232 De La Cruz Blvd., #C
Santa Clara, CA 95054,

         Counterclaimant,

   v.

SGS TOOLS COMPANY
55 South Main Street
Munroe Falls, Ohio 44262,

and

DAUPHIN PRECISION TOOL, LLC
200 Front Street
Millberg, PA 17061,

         Counterdefendants.

Counterclaimant DESTINY TOOL(hereinafter "Destiny") by and through its attorneys,

RCI/383414 1/LD

complains of counterdefendants SGS TOOL COMPANY (hereinafter "SGS") and DAUPHIN

PRECISION TOOL, LLC. (hereinafter "Dauphin") as follows:

## THE PARTIES

1       Destiny Tool is a corporation organized and existing under the laws of the State of

California, having its principal place of business located at 3232 De La Cruz Blvd , #C, Santa

Clara, CA 95054  Destiny Tool is engaged in the business of manufacturing, marketing and

selling cutting tool products such as carbide end mills.

2       Upon information and belief, counter-defendant SGS is a corporation organized

and existing under the laws of the State of Ohio, having its principal place of business located in

Munroe Falls, Ohio. At all relevant times herein, SGS was in the business of selling and

manufacturing end mills.

3       Upon information and belief, counter-defendant Dauphin is a limited liability

corporation organized and existing under the laws of the State of Pennsylvania, having its

principal place of business located Millersburg, Pennsylvania. Upon information and belief,

counter-defendant Dauphin is a successor in interest of the Weldon Tool Company. At all

relevant times herein, Dauphin was in the business of selling and manufacturing end mills.

4       Upon information and belief, and at all relevant times herein, Counter-defendants

SGS and Dauphin (hereinafter collectively "Plaintiffs") sold and advertised end mills that they

claimed were patented.

## JURISDICTION AND VENUE

5       The Court has jurisdiction over the claims for declaratory relief arising under the

patent laws of the United States, 35 U.S.C. §§ 1 et seq. (Count One), pursuant to 28 U.S.C.

§ 1338 and 28 U.S.C. §§ 2201 and 2202  The Court has jurisdiction over the claims for relief

arising under the Sherman Act, 15 U.S.C. § 2 (Count Two), pursuant to 15 U.S.C. §4 and 28

- 2 -

RCI/383414 1/LD

U.S.C. §§ 1331 and 1337. The Court has jurisdiction over the claims for relief arising under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C §§ 1961 et seq. (Count Three), pursuant to 18 U.S C. § 1964(c). The Court has supplemental jurisdiction over the claims for relief arising under state law (Counts Four) pursuant to 28 U.S.C. § 1367. The Court has jurisdiction over the claims for false marking of an unpatented product (Count Five), pursuant to 35 U.S.C.S. 292.

6    Venue is proper in this district pursuant to 15 U.S.C. §§ 15, 18, 22, and 26 U.S.C. § 1965(a) and 28 U.S.C. § 1391 because each of the Plaintiffs is transacting and doing business and conducting or otherwise transacting their affairs in this district, the Plaintiffs have performed acts in furtherance of their illegal and wrongful conduct alleged in this these amended Counterclaims which have had substantial effects in this district, and a substantial part of the events giving rise to the claims in this action occurred in this district.

7    Upon information and belief, Counterclaimant alleges that Plaintiffs SGS and Dauphin have transacted business, availed themselves of the benefits of the laws and regulations of the State of Ohio, and have committed acts of fraud in Ohio and within this judicial district by claiming products were patented when in fact they were not, and by transacting other business in this district. Therefore, this Court has personal jurisdiction over each and all of the named Plaintiffs.

8    In addition, at all relevant times herein, Plaintiffs SGS and Dauphin have been selling the products under fraudulent advertising to Ohio residents, and have actively and purposely prevented Ohio businesses from entering the product market for carbide end mills.

## FACTS COMMON TO ALL CLAIMS FOR RELIEF

9    On August 21, 1990, application number 570,427 (the "Application") for a "Improved Cutting Tool" was filed with the United States Patent and Trademark Office. The Application issued into the patent-in-suit, United States Patent No. 5,049,009 (the `009 Patent) on

RCI/383414 1/LD

September 17, 1991, (See **Exhibit A**.) which described subject matter previously disclosed by United States Patent No. 3,003,224 (the '224 Patent) which expired in the 70's. **(Exhibit B)**

10      All rights to the patent-in-suit have been assigned to Plaintiffs SGS and Dauphin.

11      Upon information and belief counterclaimant alleges that the inventors listed on the face of the '009 Patent as Graydon L. Beck, Cuyahoga Falls, Ohio and Kenneth Skrabec of Medina, Ohio, were each Vice Presidents of the Plaintiffs companies SGS and Dauphin, successor in interest to Weldon Tool Company, respectively. (Exhibit A, p. 1.) At the time it issued, the '009 Patent noted that it had been assigned to the Weldon Tool Company and SGS Tool Company. Ibid.

12      Upon information and belief counterclaimant alleges that the '009 Patent is made up of three claimed "improvements" to the design and makeup of rotary cutting tools known as "end mills."[1] First, with respect to the teeth that run up the side of the end mill ("flutes"), Counterclaimants claim that the addition of a barely-visible, 0.003 to 0.005 inch wide "cylindrical land" on the backside of the cutting edge "… serves to quiet the tool, especially at the high speeds now possible, and yields an improved surface finish on the work piece." (Ex. A, p.7, Col. 4:29-31.)

13      Upon information and belief counterclaimant alleges that the second design improvement claimed by the '009 patent in suit is a modification to the geometry of the tip or "end cutting edge" of the tool. Instead of a flat, pointed or "convex" tip with cutting teeth, the

---

[1] End mills are used to cut and shape metals. End mills look a lot like conventional drill bits, but they operate differently in two ways. Like drill bits, end mills are cylindrical in shape, made of various types of metals and generally have two ends. The "shank" section of an end mill is generally smooth and is inserted into a milling machine. These milling machines, like hand drills and drill presses, lock onto the shank portion of the end mill and rotate the tool at high RPMs. "Work material" (e.g., a block of aluminum) is then positioned under the spinning end mill and the work material is cut and shaped to its desired dimensions. Unlike, end mills, drill bits are designed to only cut with their tips or "end cutting faces." End mills, however, cut not only in a downward direction with their end cutting teeth, end mills also have cutting teeth which spiral up the sides of the tool so they can remove work material in a side-to-side direction. Accordingly, end mills cut in both the vertical and horizontal axis and, therefore, can be used to cut metal parts in all shapes and sizes. These tools are used by manufacturers of countless products such as automobiles, airplanes, computers and medical instruments.

- 4 -

'009 Patent claims that the inventors discovered that a slightly indented or "concave" angle of between 177 degrees to 179.5 degrees from horizontal axis "... has yielded unexpected results regarding tooth life. The slight angular modification greatly reduces the chipping to the end mill cutting teeth and reduces corner wear." (Ex. A, p.7, Col. 4:52-56.)

14    As stated in the patent itself:

> The two significant [design] improvements over the prior art are shown in the shape of the circular land 56 and the angular modification of the end cutting edge 70. Such slight alterations in the prior art have produced unexpectedly remarkable improvements in the quality of cut, reducing operating noise, and increasing the life of the tool particularly at the high machining speeds now possible. Such improvements would not have been obvious to an artisan of ordinary skill in the art as evidenced by the fact that such improvements are made herein on a tool that has seen little or not change in over 20 years (Ex. A, p.7, Col 4:66-5:8.) [Emphasis added.]

15    Upon information and belief counterclaimant alleges that the third "improvement" claimed by the '009 Patent is the use of a special type of metal alloy -- "Tungsten Carbide" – in the manufacture of the tool. According to the Patent, "conventionally, these end mills are made from different types of hardened steel." (Ex. A, p.6, Col. 1:13-15.) Moreover, also according to the Patent, "[f]or many years, it was not thought possible to manufacture such an end mill out of Tungsten Carbide." (Ex. A, p.8, Col. 5:13-14.) In light of these representations, the '009 Patent states:

> The present invention, when made out of tungsten carbide, lasts twenty times longer than end mills made with conventional hardened steel The composition, coupled with functional changes in the tool's design, specifically the angled end cutting edge 70, have yielded an end mill which will resist tooth chipping and experience less corner wear.
>
> Most importantly, the present invention yields an improved cut on the surface of the work piece and better chip flow. These improvements can be attributed to the k-land on the cutting surface 30 and the improved shape of the circular land on the first relief surface 52 This same improvement greatly reduces the noise caused by the tool cutting edge 16 contacting the work piece. (Ex. A, p.8, Col 5:23-35.)

16    Upon information and belief counterclaimant alleges that one of the three

"improvements" set forth in the '009 Patent, as an integral part of each one of the eight claims set forth in the patent, is the design feature known as the "circular" or "arcuate" land (Ex. A, p.7, Col. 4:24, 4:35-36 and 4:39-42). The circular land (also known in the industry as the "hair line" or 'margin") is found on a very narrow portion of the first relief wall surface (i.e., the back side of the cutting tooth) immediately adjacent to the cutting edge itself. (Ex. A, p.7, Col. 4:35-40.) This "unrelieved"[2], extremely narrow strip runs the entire length of the helically fluted teeth.

According to the Patent:

> FIG. 4 shows an enlarged view of a cutting tooth  This view more clearly illustrates a circular land 56 formed in the terminal end of first relief wall 52 immediately adjacent to and contacting cutting edge 16. Circular land 56 is essentially arcuate in shape and is essentially parallel to the arc to the cutting path 18 formed by the cutting edge 16. ... the shape of the circular land 56 is critical to the present invention, serves to quiet the tool, especially at the high speeds now possible, and yields an improved surface finish on the work piece.
>
> The circular land 56 formed in the end of first relief wall surface 52 is essentially 0.003-0 005 inches in width 57 and is illustrated in a greatly enlarged view of FIG. 4a. The width of circular land 56 is critical  When circular land 56 is dimensioned less than 0.003 inches in width, cutting edge 16 is too sharp and the loud squeaking noise associated with the prior art tools is heard. Circular land 56 when dimensioned at a width 57 greater than 0.005 inches forms a cutting edge 16 which is too dull to perform the task for which it is designed. The circular land 56 is on the total length of cutting edge line 16. (Ex. A, p. 7, Col 4:20-43.)

/// 

/// 

---

[2] As will become apparent below, the concept of a circular land on end mills was a well-established design element in the industry. The word "unrelieved" comes from the fact that end mills are created from cylindrical blanks of whatever ferrous material the mill manufacturer decides to use (e g , high speed steel or tungsten carbide)  If an end mill manufacturer desired to create an end mill with a diameter of ½ inch, then the manufacturer would begin by using a cylindrical blank with a precise outside diameter of ½ inch. The helical cutting teeth are then created by grinding away or "relieving" portions of the cylindrical blank.  The cutting edge of the helical teeth can either be created by removing material from the cylindrical blank at a precise or "sharp" angle to the cutting edge (referred to as creating the cutting edge "up sharp") or the manufacturer can leave an extremely narrow "unrelieved" section of the original cylindrical blank on the back side or peripheral wall immediately adjacent to the cutting edge  Accordingly, the "cylindrical" or "arcuate" land described in the patent is frequently created by simply leaving a .003 to  005 inch strip along the back side of the cutting edge of the original cylindrical blank

RC1/383414 1/LD

17    Upon information and belief counterclaimant alleges that while the specification of the '009 Patent does not describe the prior art involved in end mill "end cutting edges", the Patent does state: "the two significant improvements over the prior art are shown in the shape of the circular land 56 <u>and the angular modification of the end cutting edge 70</u>." (Ex. A, p.7, Col. 4:66-68.) In this regard, the '009 Patent calls out the following:

> FIG. 5 shows an enlarged side view of the cutting end of end mill 10 ... end cutting edge 70 is shown as comprising two essentially equal edges 70a and 70b. The cutting edge of 70a and 70b meet at a center point 71 to define angle 72. The present invention, however, discloses cutting edge 70 <u>such that its two separate edges define angle 72 as ranging from 177 degrees – 179.5 degrees</u> such a change has yielded unexpected results regarding tooth life. This slight angular modification greatly reduces the chipping of end mill cutting teeth and reduces corner wear. (Ex A, p.7, Col 4:44-56 )

18    Upon information and belief counterclaimant alleges that all eight claims call out the 0.003-0.005 inch wide circular land   With respect to the "angular modification of the end cutting edge" or "dish" or "end dish" as it was known in the industry, claims 5, 6, 7 and 8 claim this aspect of the instant invention.  Specifically, independent claim 5 begins by claiming the arcuate or circular land described above (Ex. A, p.7, Col. 6:31-40).  Claim 5 continues:

> The terminal end of said end mill defining two or more end cutting edges tapered inwardly to define a concave angle ranging from about 177 degrees to about 179 5 degrees.  (Ex. A, p.7, Col. 4:41-44.)

19    Upon information and belief counterclaimant alleges that in 1976, the inventor of the '224 patent and Vice President of Weldon Tools published a technical paper on the subject of end mill geometry in general which set forth that two and three flute end mills may be made where "... *enough dish or concavity is provided to insure that the end tooth corners are approximately 003 to 005' ahead of the center of the end* "

20    Upon information and belief counterclaimant alleges that Weldon Tools published several Tool-O-Gram advertisements from 1985 on that made reference to the '224 patent as to the SKX and SKB end Mills which also disclosed that those products had a 0.003 –0.005 inch

circular land which they failed to disclose to the United States Patent office during the prosecution of the '009 patent application.

21      Upon information and belief counterclaimant alleges that Weldon Tools published several catalogs from the mid 1980's, beginning at about catalog No. 66, on that made reference to an end mill with a 0.003 –0.005 inch circular land which they purposely failed to disclose to the United States Patent office during the prosecution of the '009 patent application.

A.          **Prior Art**

22      Upon information and belief counterclaimant alleges that the Weldon Tool Quality Control Foreman, Mr. Lolopulos, was manufacturing a line of end mills known as the "Ski-Kut" line of end mills in 1973.

23      Upon information and belief counterclaimant alleges that there were two different types of Ski-Kut end mills; one was called the SKB and the other was called the SKX. Both were made of high speed steel and were designed particularly for milling aluminum just as the end mills claimed in the '009 patent.

24      Upon information and belief counterclaimant alleges that the difference between the SKB and the SKX lines of Ski-Kut end mills was that the SKB line was sharpened "up sharp" (i.e., without a circular land on the peripheral cutting teeth) and the SKX was manufactured with a circular land.

25      Upon information and belief counterclaimant alleges that the SKX line of end mills had a circular land specified to be between .003 and .005 inches wide and the SKX's were accepted or sold with circular lands between .002 and .005 inches wide.

26      Upon information and belief counterclaimant alleges that with respect to the end cutting edges of the Ski-Kut lines of end mills, both the SKX and the SKB end mills had end cutting edges with end concavity or "dish" that was in the range of approximately one-half of a degree to 5 degrees since at least 1973.

- 8 -

27    Upon information and belief counterclaimant alleges that Weldon and SGS agreed to recapture that which was disclosed in the '224 patent and its physical embodiments that Weldon had been selling for years by simply changing the composition of the end mill from high speed steal to carbide. Weldon needed SGS to manufacture these tools because Weldon did not have either the experience or the machinery to manufacture carbide end mills. Weldon did not have the specialized diamond grinding wheels that were required for molding carbide as opposed to either vitrified or borazon grinding wheels that were used for shaping high speed steel tools.

28    Upon information and belief counterclaimant alleges that the only difference between the decades old Ski-Kut line of end mills and the new line of end mills that SGS was making for Weldon out of carbide was the material (i.e , tungsten carbide versus high speed steel) – there was no difference in the geometry of the end mills themselves.

29    Upon information and belief counterclaimant alleges that Hannibal Carbide manufactured carbide tipped end mills with circular margins or hairlines of between .002 to .003 inches in width in 1970 which also had end concavity or dish of between 2 to 4 degrees.

30    There are two different types of "carbide" cutting tools – carbide tipped cutting tools and solid carbide cutting tools. Carbide tipped cutting tools are usually made with a body made out of high speed steel which has carbide tips or cutting edges braised into the tool along the peripheral cutting edge and at the end cutting face. There are no functional differences between carbide tipped cutting tools and solid carbide cutting tools.

31    Upon information and belief counterclaimant alleges that Hannibal Carbide has a sister company known as Lexington Cutter that was manufacturing and selling a carbide tipped end mills with a precise .002 to .003 inch wide circular margin or hairline in 1988.

32    Upon information and belief counterclaimant alleges that neither named inventor of the '009 Patent was involved with its prosecution or claim changes after all of the initial claims had been rejected by the patent office.

- 9 -

RC1/383414 1/LD

33      Upon information and belief counterclaimant alleges that Jeffrey Burton is the executive vice president of manufacturing at SGS Tool Company. According to Mr. Burton, cutting tools have been made from tungsten carbide since before the 1970's. As used in the cutting tool industry, the phrase "carbide" refers to an alloy which is made up of a combination of tungsten and cobalt.

34      Upon information and belief counterclaimant alleges that since at least 1949, the Metal Cutting Tool Institute began publishing a reference book known as the "Metal Cutting Tool Handbook". The 1965 edition of the Metal Cutting Tool Handbook defines end mills as follows:

> End mills have straight helical teeth on the periphery, and usually have end teeth. They may have straight or tampered shanks. Straight shank end mills may be single or double end. They may solid, inserted blade or tipped construction and may have square, chamfer, radius or ball ends. (Ex. I, 14.)

35      The Handbook defines the word "periphery" as the "... outside circumference of a cutter." (Ex. I, p. 24.) The term "cylindrical land" is defined as "[a] narrow portion of the peripheral land, adjacent to the cutting edge, having no radial relief." (Ex. I, p. 19, 20 and 23.) This is also known as a "margin." (Ex. I, 20, 23, 30.)

36      Under a section dealing with relief angles and end mills, the Handbook states:

> In the cases of cutters which must mill to a given width, and where the maintenance of this width is important, two practices are followed:
>
> 1. A very slight land or margin (sometimes called a hairline) without relief is left on the side teeth at the cutting edge. The relief angle of 2 degree to 4 degree is ground back of this flat land, except on thin saws where the relief is increased to 3 degree to 5 degree. (Ex. I, 34-35.)

37      The 1965 edition of the Metal Cutting Tool Handbook also goes through a detailed explanation of sharpening the end teeth of end mills. (Ex. I, 40-45.) Therein, this publication specifically provides that the end cutting teeth of end mills should be sharpened with an end

- 10 -

concavity of between 1/2 degree to 5 degrees. (Ex. I, 41-43, 45.)

38      Finally, under the section describing "TOOL MATERIALS", the Handbook

provides: "Currently, two general classes of tool materials cover the requirements of most milling

operations. These are high speed steels and the sintered carbide tool materials." (Ex. I, 35.) In

this regard, the Handbook also provides:

> Cemented Carbide Tool Materials – Cemented or sintered carbide
> tool materials, often called simply "carbides", are powder
> metallurgy products. The principal constituent is finally divided
> tungsten carbide which is bonded together with a small amount of
> cobalt by first forming under high pressure and then sintering at a
> high temperature. (Ex. I, 36.)

## COUNTERCLAIM FOR DECLARATORY RELIEF

39      This counterclaim is for a declaratory judgment declaring the '009 patent invalid,

unenforceable, and/or not infringed by Destiny Tool arising under the patent laws of the United

States, 35 U.S.C. § 1, et seq., and the Federal Declaratory Judgment Act, 28 U.S.C. § 2201, et

seq.

40      Jurisdiction of this Court over Count I of this Counterclaim is based upon 28

U.S.C. §§ 1331, 1338(a), 2201 and 2202, and upon Rule 13 of the Federal Rules of Civil

Procedure.

41      Venue in this Court is proper pursuant to 15 U.S.C. §§ 15, 22, and 26 and 28

U.S.C. § 1391, and Counterclaimants, by virtue of having brought suit against Destiny Tool, have

submitted itself to the jurisdiction of this Court.

## FIRST CLAIM FOR RELIEF
### (Declaration of Invalidity, Unenforceability and Non-Infringement)

42      Counterclaimant **repeat** and **reallege** and incorporate by this reference paragraphs 1

through 41, inclusive of these amended counterclaims, as though fully set forth herein.

43      Beginning in 1989, Plaintiffs, have asserted through letters, facsimile transmissions,

telephone communications and otherwise that Counterclaimants, by manufacturing carbide end

mill products in the United States, and, by thereafter selling such products in the United States, have infringed the '009 patent which they asserted was a valid patent.

44    In addition, Plaintiffs have suggested to Counterclaimant that Plaintiffs have a pending patent application which would also further cover the manufacture and sale of Counterclaimant's products in the U.S., and that, upon the issuance of said application as a patent, also would be asserted against Counterclaimant.

45    In furtherance of their unlawful attempt to coerce the payment of millions of dollars by Counterclaimant, Plaintiffs have contacted customers of Counterclaimant, asserting to them that both they and Counterclaimant are infringing the '009 patent held by the Plaintiffs.

46    Plaintiffs have wrongfully asserted, inter alia, that Counterclaimant's infringe the '009 patent, under 35 U.S.C. § 271 by the manufacture, sale, and use in the United States.

47    Destiny Tool is not liable to Plaintiffs for infringement of the '009 Patent. Any contention by Plaintiffs that the asserted '009 Patent are somehow broad enough to cover any carbide end mill made, used or sold by Destiny Tool in the U.S., would cause the asserted claims of said patents to be invalid and/or unenforceable.  Plaintiffs' allegation of such infringement constitutes an improper and unlawful assertion of § 271 designed solely to intimidate Counterclaimants to pay millions of dollars to Plaintiffs.

48    The '009 Patent is invalid, inter alia, for one or more of the following reasons:

    a.    failure to comply with 35 U.S.C. § 101 in that Graydon L. Beck and Kenneth Skrabec did not invent or discover any new and useful process, machine or manufacture, or any new and useful improvement thereof;

    b.    failure to comply with 35 U.S.C. § 102 in that the subject matter claimed in the '009 Patent is not novel and was not invented by Graydon L. Beck and Kenneth Skrabec;

    c.    failure to comply with 35 U.S.C. § 103 in that the subject matter claimed in the '009 Patent is obvious to one of ordinary skill in the art;

49    The '009 Patent is unenforceable because it was obtained through fraud and/or inequitable conduct on the U.S. Patent and Trademark Office, as described above.

50    Such fraud and/or inequitable conduct renders all claims of the '009 Patent unenforceable.

- 12 -

51    The '009 Patent is unenforceable by reason of the doctrines of "patent misuse" and "unclean hands" arising from Plaintiffs' pattern of abuse and misuse of the United States Patent system, by obtaining and attempting to enforce patent claims patterned on presently existing technology in the public domain belonging to or developed by others, and using and employing abusive and coercive strategies to intimidate parties to pay royalties to Plaintiffs, all as alleged above.

### THE ACTUAL CONTROVERSY AND THE NEED FOR DECLARATORY RELIEF

52    As a consequence of Plaintiffs' repeated and continuing assertions of infringements, demands, threats, and intimidation, there is an actual and present controversy between Plaintiffs, and their customers, and Counterclaimants as to the invalidity, unenforceability, and non-infringement by Counterclaimant of the '009 Patent and of any other patents asserted or which may hereinafter be asserted by Plaintiffs against Counterclaimant.

53    Plaintiffs' assertions, demands, threats and intimidation against Destiny Tool, its sales representatives, and their customers have caused and are causing substantial and irreparable harm to Counterclaimant. Unless restrained by this Court, Plaintiffs' assertions, demands, threats and intimidation regarding Counterclaimant's alleged infringement of the '009 Patent, and patents not yet specifically asserted and those yet to issue will continue to cause substantial and irreparable harm to Counterclaimant and intimidate their customers from doing business with them or in the carbide end mill market in general.

54    Counterclaimant, Destiny Tool has been injured and damaged by plaintiffs' filing of the First Amended These Amended Counterclaims in the present case asserting a patent that is invalid, unenforceable, and not infringed.

55    Accordingly, Counterclaimant seek a declaration from this Court that the '009 patent which Plaintiffs contend Counterclaimant and its customers infringe, be declared invalid, unenforceable and non-infringed, and that this case be declared exceptional under 35 U.S.C. § 285.

### SECOND CLAIM FOR RELIEF

### (VIOLATIONS OF SECTION TWO OF THE SHERMAN ACT (15 U.S.C. §2)

56    Counterclaimant realleges and incorporates herein by this reference paragraphs 1 through 38, inclusive of these amended counterclaims, as though fully set forth herein.

57    With respect to conduct described in this, the relevant geographic market is the United States.

RC1/383414 1/LD

58     There exists a relevant market in the United States for carbide end mills. These end mills are used to machine products made of aluminum, etc. The net effect of carbide end mills in the industry has been to substantially increase production quantity, quality, and efficiency. Plaintiffs assert that without using their '009 patent for the manufacture of carbide end mills, milling would be far more costly and time consuming.

59     Due to the conduct referred to in paragraphs 1 through 43 and 44 through 60, Plaintiffs have acquired, and contend that by virtue of the '009 patent, they control the above described relevant market of carbide end mills and all submarkets and thereby possess monopoly power in each of those markets, including the power to control market prices and exclude competition.

60     Counterclaimant contends that by virtue of the '009 patent, Plaintiffs control the sale in the U.S. of carbide end mills. Counterclaimants also assert that by reason of the '009 patent, and the claims thereof, virtually all end mills manufactured in the U.S. by Destiny Tool and all other manufacturers, become infringing products when they are sold or used in the United States unless licensed by Plaintiffs. Counterclaimants have already used threats of litigation to coerce numerous domestic manufacturers into signing settlement agreements and are currently seeking to force others to do so under threats of litigation.

61     By virtue of their control over the relevant markets and submarkets, Plaintiffs have asserted and exhibited the power to raise prices and exclude competition in each of the markets and submarkets above described.

62     Plaintiffs possess the specific intent to acquire and maintain monopoly power over the above-described relevant markets and submarkets, and have carried out, inter alia, the following predatory and anticompetitive conduct directed to that end:

a.     Fraudulently procuring patent monopoly rights via the filing of the '009 patent containing skeletal disclosures with vague and cryptic claims to read around the '224 patent previously owned and enforced by Plaintiffs; and

b.     Fraudulently withholding material information bearing on the validity of the '009 Patent from the PTO. But for these misrepresentations and omissions, the '009 Patent would not have been granted by the PTO.

- 14 -

c.     Fraudulently and inequitably procuring and extending patent monopoly rights by the acts and omissions described in paragraphs 1 through 60 above and incorporated herein by reference.

d.     Attempting to enforce and enforcing a fraudulently procured and knowingly invalid patent by threatening litigation and exclusion from the relevant markets and submarkets and harassing Counterclaimant's customers in an effort to intimidate Counterclaimant and others in the markets into exiting the market despite meritorious defenses to the validity, infringement and enforceability of the patents.

63     There exists a dangerous probability of success of monopolization by Plaintiffs of each of the relevant markets and submarkets. Plaintiffs have already succeeded in extracting settlements or market exclusion from many domestic end mill manufacturers of products in the above described relevant markets and submarkets. Plaintiffs did each of the acts alleged herein for the purpose of acquiring monopoly power to either exclude competition or control prices.

64     The above-described acts of Plaintiffs, either unilaterally or in combination or conspiracy with one another constitute monopolization and attempted monopolization and of the above-described relevant markets and submarkets, in violation of Section 2 of the Sherman Act (15 U.S.C. § 2).

65     By reason of Plaintiffs' unlawful monopolization and/or attempted monopolization, Counterclaimant, has been injured in its business and property in an amount that has yet to be determined but will be established at trial, and are entitled to the treble amount of damages sustained by Counterclaimants as a result of Plaintiffs' antitrust violations.

66     Plaintiffs' unlawful activities have also substantially injured competition and consumers in the relevant markets and submarkets.  Injury to competition includes, but is not limited to, the following:

a.     Destiny Tool end mill products have been and will continue to be affected in their ability to effectively and vigorously compete in the U.S. market because of the assertion by Plaintiffs that these products infringe and are therefore unlawful; and

b.     If Counterclaimant was to purchase a license from Plaintiffs, their costs and therefore their prices would consequently increase. Competition will be injured and the U.S. public will be forced to pay artificially increased prices for carbide

end mills, and the products manufactured by carbide end mills including
automobiles, planes, and other products; and

c.    Counterclaimant is being denied access to the market due to Plaintiffs' continued
use of the '009 patent to distinguish its goods and the goodwill associated with the
consumer in obtaining a patented product

67    The unlawful activities engaged in by Plaintiffs unreasonably restrain trade,
increase prices, and substantially and adversely affect interstate commerce.

68    Counterclaimant believes that Plaintiffs' unlawful conduct will continue and that
Counterclaimants will continue to sustain injury and damages unless Plaintiffs are enjoined from
continuing their violation of the U.S. antitrust laws through wrongful assertion of rights against
Counterclaimants under the '009 Patent, pending patent applications, and any other patents of
Plaintiffs which they assert Counterclaimant may infringe.

69    Counterclaimant is entitled to treble the amount of damages sustained by
Counterclaimants as a result of Plaintiffs' violations of the antitrust laws, together with costs,
attorneys' fees and expenses herein; and an injunction enjoining Plaintiffs from continuing their
unlawful conduct and preventing them from asserting their patents and pending patent claims as
against Counterclaimants

### THIRD CLAIM FOR RELIEF

#### (VIOLATIONS OF RICO (18 U.S.C. §1961(c))

70    Counterclaimants reallege and incorporate by this reference paragraphs 1. through
38 of this these Amended Counterclaims, as though fully set forth herein.

71    SGS is a corporation capable of holding a legal or beneficial interest in property
and, as such, constitutes a "person" within the meaning of 18 U.S.C. § 1961(3). Dauphin is a
corporation capable of holding a legal or beneficial interest in property and, as such, constitutes a
"person" within the meaning of 18 U.S.C. § 1961(3).

#### THE RICO ENTERPRISES

##### The Patent Enterprise

72    Counterclaimant is informed and believe and thereon allege that Plaintiffs SGS,
Dauphin, and Plaintiffs' attorneys and others unknown, have conducted and are conducting an
enterprise consisting of an association-in-fact for the purpose of procuring and exploiting the '009
patent held by or in the name Plaintiffs and others (the "Patent Enterprise") The continuing unit

- 16 -

formed by these parties constitutes a RICO enterprise within the meaning of 18 U.S.C. § 1961(4) which is engaged in, or the activities of which affect interstate commerce.

73     Counterclaimant is informed and believe and thereon allege that Plaintiffs SGS and Dauphin are each employed by and associated with the Patent Enterprise, and have conducted the affairs of that Enterprise, directly or indirectly through a continuing pattern of racketeering activity, and through the repeated and continuous use of the U.S. mail and the interstate use of wires in furtherance of their scheme to fraudulently obtain the issuance of patents and to illegally and wrongfully obtain payment of money through the exploitation of patents knowingly obtained through fraud and other inequitable or unlawful conduct.

74     Counterclaimant is informed and believe and thereon allege that Plaintiffs have utilized the Patent Enterprise for the prosecution and enforcement of an invalid patent, with the common purpose to fraudulently prosecute the '009 patent in the PTO and then exploit that patent through a series of threats, abusive litigation, harassment of manufacturers and their customers, overreaching licensing arrangements, and other strategies, all through a pattern of racketeering activity.

75     Counterclaimant is informed and believe and thereon allege that as part of this pattern of racketeering activity, the '009 patent which is held by the Patent Enterprise which uses the patent to maintain its market share in the carbide end mill market by threats, trade disparagement, litigation, and other forms of intimidation. As described, among the activities of the association-in-fact formed are the procurement and exploitation of the '009 patent through fraud and other inequitable or unlawful conduct, with the intent and effect of defrauding manufacturers, purchasers, and sellers of carbide end mills, including but not limited to Destiny Tool, and seeking to coerce or coercing such persons into paying large settlement fees to the association-in-fact and its representatives, or leave the market that they have a legal right to reside.

### The PTO Enterprise

76     The PTO is part of the United States Department of Commerce and is an agency of the United States government and a legal entity which constitutes a RICO enterprise within the meaning of 18 U.S.C. § 1961(4), which is engaged in, or the activities of which affect, interstate and foreign commerce (the "PTO Enterprise"). The activities of the PTO Enterprise comprise the examination and issuance of patents, among other things.

RC1/383414 1/LD

77     Counterclaimant is informed and believe and thereon allege that Plaintiffs SGS and Dauphin are associated with the PTO Enterprise in that each of them has participated in the scheme to prosecute a continued and unremitting stream of patent applications before the PTO without full or fair disclosure of all material facts, use and manipulate PTO procedures to obtain the issuance of patents such as the '009 patent, and exploit those wrongfully obtained patents.

### PATTERN OF RACKETEERING ACTIVITY

78     Counterclaimant is informed and believe and thereon allege that in their associations with and employment by the PTO Enterprise and the Patent Enterprise, Plaintiffs SGS and Dauphin have conducted and participated in the affairs of those enterprises, directly or indirectly, through a continuing pattern of racketeering activity through the repeated and continuous use of the U.S. mail and the interstate use of wires in furtherance of their scheme to fraudulently obtain the '009 Patent and to illegally and wrongfully obtain the payment of money through the exploitation of the '009 Patents knowingly obtained through fraud and other inequitable or unlawful conduct.

### USE OF U.S. MAIL AND WIRES

79     Although the following is by no means exhaustive, specific examples of Plaintiffs' utilization of the U.S mail and interstate wires in support of and furtherance of the scheme and artifice to defraud based upon the fraudulently obtained '009 Patent, include-, but are not limited to, the following:

    a.    In or about 1998, SGS used, or caused to be used, the U.S. mail to send several cease and desist letters to Steve Swift, President of New Tech alleging infringement of the '009 patent which is the subject of this action;

    b.    In or about 2002, SGS used, or caused to be used, the U.S. mail to send several cease and desist letters to Benchmark concerning Benchmark's alleged infringement;

    c.    On or about Fall of 2003, SGS used, or caused to be used, the U.S. mail to send several cease and desist letters to counterclaimants alleging infringement of the '009 patent which is the subject of this action;;

    d.    On or about Fall of 2003, SGS used, or caused to be used, the U.S. mail to send several cease and desist letters to counterclaimants alleging infringement of the '009 patent which is the subject of this action;

- 18 -

e.    In or about 2000, Plaintiffs used, or caused to be used, the U.S. mail to send several letters to the European Patent Office as to the validity of the '009 patent subject matter which they unsuccessfully claimed was patentable in Europe and which subject matter is the subject of this action;;

80    Counterclaimant is informed and believe and thereon allege that, by reason of the foregoing, Plaintiffs SGS and Dauphin have each engaged in two or more acts indictable under the Federal mail Fraud Statute, 18 U.S.C. § 1341, and/or the Federal Wire Fraud Statute, 18 U.S.C. § 1343, and have thereby engaged in predicate acts of racketeering within the meaning of 18 U.S.C. S 1961(1)(B).

81    Counterclaimant is informed and believes and thereon allege that each of the Plaintiffs named in this Count has engaged in the commission of two or more of the predicate acts within a period of ten years and each has committed at least one act of such racketeering after the effective date of RICO ("i.e. October 15, 1970").

82    All of the Plaintiffs in this Count participated in the violation of 18 U.S.C. §1962(c) in one or more capacities as primary actors and/or agents and representatives of one another and/or ciders and abettors of one another.

## CONTINUITY AND RELATEDNESS OF PATTERN OF RACKETEERING

83    Each of the foregoing acts of racketeering by the Plaintiffs are related, continuous, and part of a pattern of conduct pertaining to the '009 patent, directed toward multiple victims including but not limited to Destiny Tool and its customers, and continuing over a substantial period of time exceeding ten years. Counterclaimant is informed and believes that in addition to targeting Destiny Tool, Plaintiffs operated the PTO Enterprise and Patent Enterprise through mail fraud and wire fraud, directing similar claims of infringement, and similar threats of litigation, to among others, Benchmark and New Tech Corporation and used the U.S. mail and wires to send letters to them substantially similar to those sent to Counterclaimant. The fraudulent scheme furthered by these acts of racketeering is ongoing and continuous as Plaintiffs have indicated they would sue Destiny Tool's customers and prospective customers. Accordingly, Plaintiffs have, and are, engaged in a continuing and related pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5), which poses a threat of continued criminal activity. Furthermore, Plaintiffs having direct knowledge of the patent's invalidity have continued to enforce the same without any change in advertising or marking.

**RICO INJURY**

84      As a direct and proximate result of the Plaintiffs' participation in and conduct of the affairs of the Patent and PTO Enterprises through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c), Counterclaimant and it's customers have been injured in their business and property and, pursuant to the civil remedy provisions of 18 U.S.C. § 1964(c), are thereby entitled to recover three-fold the damages they have suffered, together with their costs of suit and reasonable attorneys fees thereon, from Plaintiffs, and a declaration that the '009 carbide end mill patent and pending patent claims asserted by Plaintiffs against Counterclaimants are invalid and/or unenforceable.

## FOURTH CLAIM FOR RELIEF

### *(VIOLATIONS OF THE OHIO UNFAIR COMPETITION LAW*

85      Counterclaimant repeats and realleges and incorporates by reference paragraphs 1 through 60, 58 through 70, 72 through 86, and 88 through 93 inclusive of this these Amended Counterclaims, as though fully set forth herein.

86      The above described acts and practices of Counterclaimants constitute unfair competition in violation of the Ohio Unfair Competition Act.

87      Counterclaimants as well as consumers, i.e., the entire public, will continue to sustain injury and damages from this unfair competition unless Plaintiffs are enjoined from continuing their unlawful conduct and seeking to exact a tax on the public in the form of an unlawful "royalty".

88      As a direct and proximate result of Plaintiffs' violations of the Ohio Unfair Competition Act, Counterclaimant is entitled to recover reasonable attorneys fees and costs in connection with this claim, appropriate restitution from Counterclaimant of all monies received by reason of their unlawful and unfair business practices, an injunction barring Counterclaimants from their wrongful assertions of patent infringement and pending patent claims against Counterclaimant, and such other equitable relief as may be just and appropriate.

RCI/383414 1/LD

- 20 -

## FIFTH CLAIM FOR RELIEF

### *(FALSE MARKING (35 U.S.C. §292))*

89      Plaintiffs have violated 35 USC §292(a) by advertising in connection with Carbide End Mills, the word "patented" (or similar words), for the purpose of deceiving the public.

90      The K-land aspect of the SKX and SKB end mills sold by Plaintiffs is unpatented for the purposes of 35 U.S.C. 292(a).

91      The Carbide aspect of the SKX and SKB end mills sold by Plaintiffs is unpatented for the purposes of 35 U.S.C. 292(a).

92      The 0.003 to 0.005 inch wide "cylindrical land" on the backside of the cutting edge aspect of the SKX and SKB end mills sold by Plaintiffs is unpatented for the purposes of 35 U.S.C. 292(a).

93      The indented or "concave" angle of between 177 degrees to 179.5 degrees from horizontal axis aspect of the SKX and SKB end mills sold by Plaintiffs is unpatented for the purposes of 35 U.S.C. 292(a).

94      Upon Information and belief, Counterclaimant alleges that Plaintiffs have committed thousands of separate offenses through their web pages advertising, catalog advertising, product advertising, and statements made by their representatives to the public.

WHEREFORE, Counterclaimant Destiny Tool prays for judgment as follows:

As to Count I:

    a.  for a declaratory judgment that each of the claims of the '009 Patent and any other patents asserted against Counterclaimant by Counterclaimants are .invalid, unenforceable and not infringed by Destiny Tool;

    b.  for their costs of suit; including reasonable attorneys fees;

    c  for such other relief as the Court may deem equitable and just;

As for Count II and III:

    a.  for actual damages, according to proof, trebled pursuant to law;

    b.  for their costs of suit; including reasonable attorneys fees;

    c.  for an injunction restraining Defendants' threats of instituting or institution of any litigation alleging infringement of the '009 patent or pending patent claims of Defendants as against Plaintiff and Plaintiff's customers;

RC1/383414 1/LD

    d.  for such other relief as the Court may deem equitable and just;

As to Count IV:

    a.  for an injunction restraining Defendants' acts of unfair competition;

    b   for their costs of suit; including reasonable attorneys fees;

    c.  for such other relief as the Court may deem equitable and just;

As to Count V:

    a.  for the statutory damages set forth in 35 U.S.C. §292;

    b.  for their costs of suit; including reasonable attorneys fees; and

    c.  for such other relief as the Court may deem equitable and just.


Dated: October 17, 2005          ROPERS, MAJESKI, KOHN & BENTLEY


By:_____
    ROBERT P. ANDRIS
    LAEL D. BELOATE
    Attorneys for Counterclaimant
    MISSION VALLEY FORD TRUCK
    SALES, INC., a California corporation


## DEMAND FOR JURY

Counterclaimant hereby demands a trial by jury.


Dated: October 17, 2005


_____
ROBERT P. ANDRIS (CA SBN 130290)
randris@ropers.com
ROPERS, MAJESKI, KOHN & BENTLEY
1001 Marshall Street
Redwood City, CA  94063
Telephone:  (650) 364-8200
Facsimile: (650) 780-1701
Attorneys for Defendant


- 22 -